IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
-------------------------------------------------------X
                                          :
ELECTRO-METHODS, INC.                     :        3:06 CV 686 (JBA)
                                          :
                                          :
V.                                        :
                                          :
ADOLF MELLER COMPANY,                     :        DATE: FEB. 7, 2007
D/B/A MELLER OPTICS, INC.,                :
D/B/A ADVANCED LASER TECHNOLOGIES  :
-------------------------------------------------------X
```

RULING ON PLAINTIFF'S APPLICATION FOR PREJUDGMENT REMEDY, MOTION FOR
DISCLOSURE OF ASSETS & AMENDED MOTION FOR PREJUDGMENT REMEDY

Plaintiff Electro-Methods, Inc. ["EMI"], a corporation in the business of manufacturing

and selling jet engine parts, commenced this action on May 2, 2006 against defendant Adolf

Meller Company, D/B/A/ Meller Optics, Inc., D/B/A/ Advanced Laser Technologies ["Advanced

Laser"], in which Complaint (Dkt. #1) plaintiff alleges breach of contract, or in the

alternative, negligence arising out of defendant's failure to perform under bids in connection

with part numbers 5015T39G02 and 2002M98P02 (First to Fourth Counts); breach of contract

arising out of defendant's failure to perform under a bid in connection with part numbers

1804M55P04, L56773P02, and 1804M55P03 (Fifth Count); and breach of contract, or in the

alternative, negligence, arising out of defendant's failure to perform under a bid in

connection with part number 9528M94G01 (Sixth and Seventh Counts).

On the same day, plaintiff filed its Application for Prejudgment Remedy and affidavit

in support (Dkt. #5)[1] and Motion for Prejudgment Disclosure of Property and Assets (Dkt.

#6). On May 25, 2006, defendant filed its Answer and Counterclaim in which defendant

---

[1]Attached is a copy of "Rhode Island Corporation Search" for Adolf Meller Company and
Meller Optics (Exhs. A-B) and copy of ALT Quotation Number Q-1676, dated March 24, 2005 (Exh.
C).

asserted claims for breach of contract and unjust enrichment for plaintiff's failure to pay for the products plaintiff ordered and received. (Dkt. #9).[2]   On the same day, defendant filed its objection to plaintiff's Application for Prejudgment Remedy and brief in support.  (Dkts. ##10-11).[3]  Plaintiff filed its Answer to defendant's Counterclaim on June 14, 2006 (Dkt. #19), and six days later, plaintiff filed its brief in opposition to defendant's objection.  (Dkt. #24).   On October 14, 2006, defendant's Answer and Counterclaim (Dkt. #9) was superseded by its Amended Answer, in which defendant omits the above-referenced Counterclaim.  (Dkt. #42; see Dkts. ##33-34, 38).  On November 7, 2006, plaintiff filed an Amended Motion for Prejudgment Remedy in which it seeks to secure the sum of $450,000, instead of the original amount of $150,000.  (Dkt. #53).

A hearing was held before this Magistrate Judge on November 14 and 15, 2006, at which Dani Stephens, EMI's Vice President of Operations, and William Soucy, its Vice President, testified for plaintiff, and George Gikas, Advanced Laser's former Director of Operations, and  Ray Wilder, Jr., its General Manager and former Quality Manager,  testified for defendant.  (See Dkts. ##62-63 ["11/14/06 Tr." & "11/15/06 Tr."]. See also Dkts. #55-56, 58).[4]

On November 22, 2006, plaintiff filed its Affidavit Re: Attorneys' Fees and Expenses (Dkt. #59),[5] to which defendant filed its brief in opposition six days later.  (Dkts. #60-

---

[2]Attached as Exh. A were copies of various invoices from Advanced Laser to EMI.

[3]Attached to Dkt. #10 was an affidavit from David Lydon, President of Advanced Laser, sworn to May 25, 2006.

[4]Exhs. 1-26 were admitted for plaintiff; Exhs. A-O were admitted for defendant.  (Dkt. #57).  The binders that constitute Exhs. 2, 4, 6 and 7 were particularly helpful to the Court, as well as Exhs. 1, 3, 5, and 8-13.

[5]Attached to plaintiff's affidavit are the following four exhibits: copy of "Firm Profile" for Bryne & Storm, P.C.  (Exh. A); copy of billing time for plaintiff's counsel and Attorney Jean Sorich

61).[6]  On January 17, 2007, plaintiff filed its reply brief.  (Dkt. #75).[7]

On December 6, 2006, plaintiff filed its Post-Hearing Brief (Dkt. #64; <u>see</u> Dkt. #54).[8] Twenty-one days later, defendant filed its Post-Hearing Brief (Dkt. #68; <u>see</u> Dkt. #54).  On January 17, 2007, plaintiff filed its Motion for Additional Pages (Dkt. #73), its Post-Hearing Reply Brief (Dkt. #72),[9] and its Motion to Reopen Evidence in Hearing on Plaintiff's Application for Prejudgment Remedy (Dkt. #74).[10]

For the reasons stated below, plaintiff's Application for Prejudgment Remedy (Dkt. #5) is <u>denied as moot</u>; plaintiff's Motion to Reopen Evidence (Dkt. #74) is <u>granted</u>; plaintiff's Motion for Additional Pages (Dkt. #73) is <u>granted</u>; plaintiff's  Motion for Prejudgment Disclosure of Property and Assets (Dkt. #6) is <u>granted</u>; and plaintiff's Amended Motion for Prejudgment Remedy (Dkt. #53) is <u>granted in part in the amount of $**250,000**</u>.[11]

---

(Exh. B); copy of billing time for Attorney James Bryne (Exh. C); and copy of record of other expenses charged to plaintiff (Exh. D).

[6]Attached to defendant's brief in support (Dkt. #60) as Dkt. #61 are copies of records of EMI (Exhs. A, C-D); correspondence between EMI and Advanced Laser, dated November 19, 2002 (Exh. B); copy of "Breakdown of EMI Claims against . . . Advanced Laser" (Exh. E); and correspondence between counsel, dated October 26, 2006 (Exh. B)[sic].

[7]Attached is a copy of: Sandhya J. Bathija, Law Firms' Hourly Rates Edge Up Again, CONN. L. TRIB., Dec. 18, 2006, at 12.

[8]Attached is a copy of case law.

[9]Attached are copies of documents from Advanced Laser, Bates Stamp numbers 38, 41-53 and 55.

[10]Attached are declarations of Attorney Rodger C. Boe and Dani Stephens, both sworn to January 17, 2007, a copy of a purchase order, dated October 14, 2001, and a copy of case law.

[11]As discussed in more detail in Sections I.B to I.D <u>infra</u>, $139,666.60 is for total damages, $ 95,690.17 is for attorneys' fees, and $6,877.01 is for costs, totaling $242,233.78.

## I. DISCUSSION

### A. LEGAL STANDARD FOR PREJUDGMENT REMEDY

Pursuant to the Connecticut Prejudgment Remedy Statute, CONN. GEN. STAT. § 52-278d(a):

> the standard for issuing a prejudgment remedy is whether or not there is probable cause to sustain the validity of the plaintiff's claim. . . . The legal idea of probable cause is a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it. Probable cause is a flexible common sense standard. It does not demand that a belief be correct or more likely true than false.

Qualitive Reasoning Sys., Inc. v. Computer Scis. Corp., 3:98 CV 554 (AWT), 2000 WL 852127, at *9 (D. Conn. Mar. 31, 2000)(multiple citations & internal quotations omitted). At a hearing on a prejudgment remedy, a plaintiff is "bound to furnish proof of his damages with reasonable probability, and not leave the trial court to speculation and conjecture." Mullai v. Mullai, 1 Conn. App. 93, 95 (Conn. App. 1983)(per curiam). Prejudgment remedy proceedings "are only concerned with whether and to what extent the plaintiff is entitled to have property of the defendant held in the custody of the law pending adjudication of the merits of that action." Benton v. Simpson, 78 Conn. App. 746, 751-52 (Conn. App. 2003)(citations and internal quotations omitted). Moreover, a prejudgment remedy hearing "is not contemplated to be a full scale trial on the merits of plaintiff's claims . . . . The court's role in such a hearing is to determine probable cause by weighing probabilities" of both "legal and factual issues." Bank of Boston Connecticut v. Schlessinger, 220 Conn. 152, 156 (1991) (multiple citations omitted).

A court must determine, in light of its assessment of the legal issues and the credibility of the witnesses, whether a plaintiff has sustained the validity of his claim.

Benton, 78 Conn. App. at 758. In addition to the "the validity of the plaintiff's claim," the court must also consider "the amount that is being sought." Calfee v. Usman, 224 Conn. 29, 38 (1992)(citation omitted). The damages that plaintiff claims "need not be established with precision but only on the basis of evidence yielding a fair and reasonable estimate." Savalle v. Kobyluck, 3:00 CV 675 (WWE), 2001 WL 1913746, at *2 (D. Conn. Sept. 12, 2001)(citation omitted).

As stated above, plaintiff has alleged claims of breach of contract, or in the alternative, negligence with respect to purchase orders 108809, 110639 and 115512 in connection with part number 5015T39G02 ["5015s"]; breach of contract, or in the alternative, negligence, with respect to purchase order 113820 in connection with part number 2002M98P02 ["2002s"]; breach of contract with respect to purchase orders 121715, 124545 and 125895 in connection with part numbers 1804M55P04, L56773P02 and 1804M55P03; and breach of contract, or in the alternative, negligence, with respect to purchase order 125805 in connection with part number 9528M94G01.

### B. FACTUAL FINDINGS

EMI is in the business of manufacturing jet engine components for the aerospace industry and Advanced Laser is a vendor of EMI for laser cutting and laser marking services. (See 11/14/06 Tr. 3-5). According to Dani Stephens, plaintiff's Vice President of Operations (see 11/14/06 Tr. 3), EMI would place a purchase order with Advanced Laser, which could be supplemented. (See 11/14/06 Tr. 5-6). Advanced Laser would acknowledge the purchase orders by signing them or by sending a written acknowledgment to EMI, though there were times when Advance Laser would not acknowledge the purchase orders but would just commence the work. (See 11/14/06 Tr. 7). EMI would provide Advanced Laser with the "operation sheets" ["op sheets"] and drawings, which were developed by EMI, and would

"eventually" send the parts to Advanced Laser for laser cutting and marking services.  (See 11/14/06 Tr. 6-8).  A "First Piece Inspection Report" is generated after a vendor sends a first piece to EMI to ensure that the op sheet or drawing requirements are met. (See 11/14/06 Tr. 9).  EMI responds to this report prior to the vendor completing the rest of the work.  (See id.).  After Advanced Laser would perform the work, it would return the parts to EMI with a packing slip, and EMI would pay Advanced Laser in thirty to forty-five days after receipt of the invoice.  (See id.).  According to Stephens, when EMI received parts from Advanced Laser, the parts were "not always" inspected right away and even if they were not inspected within that thirty-to-forty-five-day-period, EMI would still remit payment.  (See 11/14/06 Tr. 10).  However, if the parts were inspected and a non-conformance to the op sheet or the drawing was observed, a "Non-Conformance Review Form" ["NCRF"] would be generated and the non-conforming part would be held for scrap or the part, along with the NCRF, would be sent to Advanced Laser for rework[12] to make the part conforming.  (See 11/14/06 Tr. 10-11).  The NCRF would be sent by mail or would accompany the packing slip.  (See 11/14/06 Tr. 11-12).

William Soucy, plaintiff's Vice President of Operations (see 11/14/06 Tr. 146), sets quality control policy for EMI and makes the decision to scrap non-conforming parts, which decision-making process involves reviewing how an inspector inspected the parts.  (See 11/14/06 Tr. 147-48; see also 11/14/06 Tr. 151).  He works with a quality team on a daily basis and is notified when a non-conforming part needs customer review or needs to go to the Materials Review Board ["MRB"].  (11/14/06 Tr. 146-47). Depending on the technical nature of the non-conformance, Soucy can perform a visual inspection or the part can be

---

[12]The vendor can "rework" the part to try to make it conform to the op sheet.  (See 11/14/06 Tr. 11).  The part is then resubmitted to EMI for evaluation.  (Id.).

placed on a coordinate measuring machine ["CMM"] which inspects multiple datums simultaneously, and which can show the dimension of a feature and examine if it is within blueprint tolerance. (See 11/14/06 Tr. 148-50). Soucy explained that the aerospace field is very complex and the precision of these parts is paramount. (See 11/14/06 Tr. 151-52). Once the parts are sent to EMI's customers, most of which manufacture parts for the military, the parts do not undergo further inspection -- "[t]hey actually go right into the engines." (See id.). The parts are shipped directly into war areas, like Iraq, and if there are non-conforming parts, they can cause an airplane to crash; as Soucy testified bluntly, "[i]t's just that simple." (See 11/14/06 Tr. 151-52).

The operation sheets (see, e.g., Exh. 4, Tab 3) explain to the supplier how to perform the operation and the parts will be deemed non-conforming if they cannot pass an airflow test. (See 11/14/06 Tr. 179-80). If the holes are too small, they impede air flow in the plane's engine and will not keep the engine cool. (See 11/14/06 Tr. 184-85). If one hole is bad, the entire part is not scrapped, particularly if the holes are too large, but the percentage of permissible non-conforming holes cannot allow for a mass amount of cooling in one part of an engine because the other part of the engine will burn up. (See 11/14/06 Tr. 185-86). Passing an air flow test is an obligation of Advanced Laser's performance. (See 11/14/06 Tr. 186, 220-22; Exh. 4, Tab 3, at 3).

Ray Wilder, who is currently the General Manager of Advanced Laser (see 11/15/06 Tr. 105, 135), but was, for the first three years of its existence, both the General Manager and the Quality Manager of Advanced Laser, was responsible for manufacturing output and for overseeing the quality of the parts that were shipped.[13] (See 11/15/06 Tr. 135-37). In

---

[13]According to Wilder, holding both positions in this industry is not a "conflict." (See 11/15/06 Tr. 137).

order of importance, Wilder characterized the purchase orders as the "Bible," then the "pictorial part of the drawing," then the notes on the drawing, and then the specifications. (11/15/06 Tr. 118). On this basis, not every piece that Advanced Laser lasered had to be inspected, but rather, according to Wilder, sampling inspection was acceptable. (See 11/15/06 Tr. 161-63). According to Wilder, if a part was non-conforming, Advanced Laser would first try to rework the part internally and if it was still non-conforming, Advanced Laser would still send it to EMI but would physically attach a "tag" and mark on the certificate that the parts are to be evaluated by the customer to see if there is a chance that the part could still be used. (See 11/15/06 Tr. 190-95). Advanced Laser would then do an internal "corrective action review" ["CAR"]. (See 11/15/06 Tr. 189-93). Wilder, however, could not recall if there were any instances of this happening with EMI. (See 11/15/06 Tr. 193).

### 1. FIRST AND SECOND COUNTS – P.O. NOS. 108809, 110639 & 115512/ PART NO. **5015T39G02**

Plaintiff seeks damages with respect to the 5015s that were the subject of three purchase orders: Nos. 108809, 110639 and 115512. (See, e.g., Exh. 6, Tab 1).[14] According to Stephens, work was not performed under the first purchase order, No. 108809, because Advanced Laser could not install the slots in accordance with the blueprint requirements; thus, a new purchase order, No. 110639, was issued on October 14, 2001 for three hundred and seventy parts. (See 11/14/06 Tr. 38-39; Exh. 6, Tab 1). Eleven days later, Advanced Laser sent an acknowledgment of the purchase order in which the "First P[iece] Inspection" and "Process Certification Req'd" was noted. (Exh. 6, Tab 2). According to EMI, Advanced Laser's work did not comply with the original purchase order No. 110639, as Advanced Laser did not make the "actuating ring" for the 5015s properly. (See 11/14/06 Tr. 73-74). The

_____

[14]All of the 5015s have been discarded by EMI. (See 11/14/06 Tr. 73-74).

manufacture of the ring assembly was described in the op sheets, which included detailed

instructions including the blueprint dimensions and a listing of a series of different tooling

operations. (See 11/14/06 Tr. 73-75). These parts were to undergo "Operation 240" by

Advanced Laser, which is to cut sixty-eight slots in this ring (11/14/06 Tr. 75); the

development of the laser cutting parameters for these sixty-eight slots was the responsibility

of George Gikas, who was Advanced Laser's Director of Operations at the time (see 11/15/06

Tr. 9-11, 57), and the position of the sixty-eight slots was a "very critical" or "major

characteristic" of the part. (11/14/06 Tr. 222). As Stephens testified, Advanced Laser sent

non-conforming parts to EMI, so EMI went to its own customer and requested an increase

in the tolerances on the blueprints so that Advanced Laser's work could be accepted.

(11/14/06 Tr. 38-39). However, EMI's customer could not agree to the change so EMI was

"forced to close [the] contract short" because of the "amount of scrap that was generated

by Advanced Laser."[15] (11/14/06 Tr. 39).

### a. OPERATION 240, REVISION D

In late 2002, the dimensions in Operation 240 were revised to slightly reduce the final

dimensions, as stated in Operation 240, Revision D. (See 11/14/06 Tr. 75-76, 79, 226-28;

Exh. A). When this revision occurred, EMI "cancelled" the pre-existing purchase order and

issued a new purchase order, bearing the same number, asking Advanced Laser to make the

---

[15]Specifically, NCRF 102920 reveals that one part was returned to vendor on February 25, 2002 (Exh. 6, Tab 5); NCRF 1103073 reveals that one part was rejected and scrapped on May 7, 2002 (Exh. 6, Tab 7); NCRF 104243 reveals that one part was rejected and scrapped on December 19, 2002 (Exh. 6, Tab 20); NCRF 103812 reveals that one part was rejected and scrapped on January 24, 2003 (Exh. 6, Tab 26); NCRF 104999 reveals that fifty-three parts out of one hundred and two were scrapped on November 4, 2003 (Exh. 6, Tab 35); and NCRF 106562 reveals that of the forty-five inspected, forty-five were rejected and scrapped on March 18, 2005 (Exh. 6, Tab 41), for a total of one hundred and two of the 5015s scrapped. Stephens testified that she believed that one hundred and one of the 5015s were scrapped. (11/14/06 Tr. 40).

parts according to Operation 240, Revision D.[16] (See 11/14/06 Tr. 76-77, 80; Exh. A). In a facsimile to Wilder, dated November 19, 2002, Stephens memorialized the cancelling of the old purchase order and the issuing of Operation 240, Revision D the new purchase order. (See 11/14/06 Tr. 135; Exh. I). Additionally, in this correspondence, Wilder was informed by Stephens that there were "several non-conformances on the two parts [that Advanced Laser] recently sent [to EMI]." (See 11/14/06 Tr. 135-36; Exh. I).

Initially, EMI contracted with Advanced Laser to manufacture parts to the drawing specifications outlined in Operation 240, Revision D, but when Advanced Laser could not meet the specifications, EMI "ended up having to mill [the parts], in house, . . . in order to make the contract with [its] customer," the U.S. Navy. (11/14/06 Tr. 129, 86).[17] Additionally, because Advanced Laser was not able to laser the slots so that they could be verified on the CMM, it employed a nearby machine shop, Northeast Manufacturing, for the lasering work since Northeast Manufacturing's CMM matched EMI's CMM for inspection. (See 11/15/06 Tr. 11-12, 17). According to Gikas, EMI said that it would machine the slots so that Advanced Laser would only have to rough machine them prior to their submission to EMI. (See 11/15/06 Tr. 13). Thus, Advanced Laser started shipping the parts with the

---

[16]According to Stephens, EMI does not put the reasons in a purchase order for non-conformance, but rather, EMI's practice when a vendor is unable to perform on a purchase order is to issue a subsequent purchase order to tie up loose ends in its paperwork. (See 11/14/06 Tr. 129-30). Additionally, Stephens testified that EMI would often "supplement" a purchase order, which it did in this case. (See 11/14/06 Tr. 6, 76; Exh. I).

According to Stephens, it was not "necessary" to send a notice of breach to Advanced Laser at this time because that would have created an adversarial relationship; Stephens admitted, however, that she did not address Advanced Laser's "liability" until two years later, in November 2004, when the parties agreed upon a twenty percent discount on EMI's current and future purchase orders for a total of $70,000. (See 11/14/06 Tr. 133-34, 137-43).

[17]It was only after Revision D was issued that EMI began this milling of the parts upon receipt from Advanced Laser. (See 11/14/06 Tr. 128).

"stock" left on which EMI would machine off.  (See 11/14/06 Tr. 85-86; 11/15/06 Tr. 17-18, 22).  According to Gikas, EMI never told him this was a problem.  (See 11/14/06 Tr. 84; 11/15/06 Tr. 22, 24, 25-26).

Right before the parties agreed to Operation 240, Revision D, EMI provided Advanced Laser with a "functional gauge"[18] which was calibrated to EMI's CMM, that Advanced Laser could put on its own laser tool so that the parts could be inspected to the blueprint requirements.  (See 11/15/06 Tr. 19-23, 52, 54, 57-58, 87-89).  The functional gauge was used to determine the location of the slots, not the size of the slots. (See Tr. 11/15/06 Tr. 19, 50).

According to Gikas, prior to leaving Advanced Laser, the parts were inspected on "process sheets" which were then attached to the "travelers."[19]  (See Exhs. J-M; 11/15/06 Tr. 32-33).  Wilder sent out Certificates of Conformance, certifying that the parts met the drawing requirements when they left Advanced Laser (see 11/15/06 Tr. 98-99), and on January 8, 2003, Advanced Laser completed inspection reports for the 5015s, verifying that the parts were conforming.[20]  (See 11/15/06 Tr. 66-67).  However, not all of the 5015s were

[18]Wilder testified that the functional gauge is "[j]ust another measuring tool;" it is a "[c]onvenience," and "an excellent reference tool to be used for acceptance." (11/15/06 Tr. 218-19).

[19]Defendant and plaintiff refer to "travelers" in different ways. Stephens testified that a "traveler" is a "sequence of operations that a part . . . must go through in order to meet the end item requirements." (See 11/14/06 Tr. 86-87).  According to Soucy, it is not EMI's practice to keep travelers for non-conforming parts because non-conforming parts are scrap. (See 11/14/06 Tr. 208).  Plaintiff disputes defendant's definition of a traveler as merely an "inspection report." (See Dkt. #68, at 8; Dkt. #72, at 11).  For example, Soucy testified that when the laser operations come to EMI "certified," he will "inspect" the certifications, but "[n]ot necessarily the parts." (11/14/06 Tr. 246-47).

[20]The inspection reports include variable data, which is derived from the upper and lower limits of dimensions, and attribute data which is the average of where the range is within the quantity of parts.  The variable data can be determined from a pin test in which a "deltronic plug" or no-go pin is used to test the size of the holes.  (See 11/14/06 Tr. 182-83).

inspected by Advanced Laser (see 11/15/06 Tr. 117); rather, the first and last pieces and "numerous pieces [were] inspected in between," and based on that, Gikas testified that there was enough statistical evidence so that not all of the parts had to be inspected. (See 11/15/06 Tr. 91-92, 122).[21] According to Wilder, "sampling" or "normal" inspection was permitted in the purchase order as the purchase order references Standard 45208 and AS9000, paragraph 4.6.4.3. (See 11/15/06 Tr. 152-55, 160-61; Exh. 6, Tab 1, at 1-2). However, the standards referenced in the purchase order do not provide for "sampling" inspection. (See 11/15/06 Tr. 165-68; Exhs. 18-19).

Gikas testified that the parts Advanced Laser sent to EMI were one hundred percent on the functional gauge in a "stock on" condition (see 11/15/06 Tr. 30-31, 94, 123; see also 11/15/06 Tr. 34-35), though this is not reflected in the inspection reports. (See 11/15/06 Tr. 94-95). Wilder urged that while this fact "may not have been documented, . . . [Advanced Laser] may have been inspected [one] hundred percent." (11/15/06 Tr. 161). Moreover, in addition to inspecting the parts to "true position" with the functional gauge, Advanced Laser also inspected the size of the slots with a gauge pin. (See 11/15/06 Tr. 90-91).

Once the pieces were at EMI, EMI could use a gauge pin or a vernier to check the size of the hole which would be undersized by ten thousands of an inch in a "stock on" condition. (See Tr. 11/14/06 Tr. 185; 11/15/06 Tr. 51, 56). With hesitation, Gikas testified that EMI told him that the functional gauge took the place of meeting the requirements on the op sheets, though Gikas could not recall who said this. (See 11/15/06 Tr. 53-56; but see 11/15/06 Tr. 58). This testimony notwithstanding, the op sheets specifically note that the

---

[21]This notwithstanding, Gikas also testified that he was not sure that statistical evidence was used in this matter. (See 11/15/06 Tr. 94-95).

location of the slots is a "major characteristic" or "critical characteristic" of the part (see Exh. 6, Tab 46, at 5; see 11/15/06 Tr. 95-98), Wilder confirmed that the purchase order is the "Bible" (see 11/15/06 Tr. 118), and although using the functional gauge in connection with the 5015s was "appropriate" under the circumstances, nowhere in the purchase order, nor in the op sheets, is a functional gauge referenced. Additionally, EMI made clear to Advanced Laser, in a letter dated February 16, 2004, that although the functional gauge was provided to Advanced Laser to provide coordination of inspection methods, the "purchase order does not state that the parts are to be made to the ga[u]ge in lieu of the operation sheet requirements." (Exh. 23).

As stated above, when Advanced Laser made the slots smaller to conform to Operation 240, Revision D, EMI would have to mill the slots after Advanced Laser's work was complete so that the slots would meet blueprint tolerances. (See 11/14/06 Tr. 84-86, 226). However, even with Revision D, some of the slots would still be so big so that even when EMI "machined" them with its very precise milling machine, the pieces were not usable. (See 11/14/06 Tr. 226-30). According to Soucy, Advanced Laser may not have been using a 360,000-increment rotary table which would be necessary to meet the blueprint tolerances. (See 11/14/06 Tr. 229-31, 233). Soucy testified that Gikas explicitly agreed that the pieces Advanced Laser was producing were non-conforming. (See 11/14/06 Tr. 260-61). Gikas testified, however, that although Advanced Laser knew how to do the lasering work requested, it could not do so, which is why Advanced Laser subcontracted with Northeast Manufacturers for Northeast's CMM to correspond with EMI's CMM. (See 11/15/06 Tr. 11-12, 54).

According to Soucy, EMI spoke "more than ten times" with Advanced Laser, and in particular with Gikas, about the non-conformities with the 5015s and specifically, about

Advanced Lasers' trouble holding the tolerances, which resulted in an unequal spacing between the holes and non-conformity with the op sheets. (11/14/06 Tr. 208-10, 217-20). In contrast, Gikas testified that he "[n]ever, [n]ever," "[n]ot once" discussed the 5015s with Soucy. (11/15/06 Tr. 73-74). Gikas conceded that although there were a "few bad 2002s" in the initial process development process, there was never any discussion about the 5015s. (See 11/15/06 Tr. 92)(emphasis added). Additionally, according to Gikas and Wilder, Advanced Laser never received NCRFs with respect to the 5015s, nor did they receive any parts back because the parts had too much "stock." (11/15/06 Tr. 26, 39, 58, 113-14, 117). Gikas only acknowledged that Advanced Laser received NCRFs by mail, fax or attached to the parts "a couple of times when [Advanced Laser] first started the parts." (See 11/15/06 Tr. 59). Wilder further testified that, prior to this lawsuit, he never received any NCRFs from EMI with respect to the 2002s and the 5015s, and was never asked for preventative action nor was he given the opportunity to perform corrective action on any of the parts. (See 11/15/06 Tr. 113-14, 117, 138, 140-41).[22]

In direct contrast to this testimony, in a facsimile to Wilder regarding the 5015s, dated November 19, 2002, Stephens informed Wilder that there were "several non-conformances on the two parts [that Advanced Laser] recently sent [to EMI]." (See 11/14/06 Tr. 136; Exh. I).

b. INSPECTION AT EMI

Stephens "believe[s]" that EMI inspected the parts before milling them, but even

---

[22]Wilder additionally testified that to the extent Gikas thought that Advanced Laser may have received NCRFs from EMI, Gikas may not have recognized what the document was because Gikas was not a quality expert. (See 11/15/06 Tr. 142-44). Wilder added that Fred Masconi or Joe Mauro may have been the quality manager at the time the NCRFs were issued. (See 11/15/06 Tr. 147-51).

without an inspection, if the slots were off location after EMI received them, the slots would not improve after the milling work.  (See 11/14/06 Tr. 84-86; but see Tr. 11/15/06 28, 61). Gikas, however, testified that milling can have "tremendous effects" on the parts, such that one would never mill a piece without inspecting it first.  (11/15/06 Tr. 41).  Additionally, according to Gikas, since Advanced Laser sent the functional gauge with the parts, it would have been "easy" for EMI to inspect the parts upon arrival.  (Id.).   EMI's traveler[23] for one piece of that part number reveals that the piece was certified at EMI for Operations 240 and 250 on June 12, 2003 (Exh. C), and there is no indication on that page of any non-conformances before the parts were sent for milling work. (See 11/14/06 Tr. 93-94).  The traveler, however, was attached to an NCRF.  (See 11/14/06 Tr. 94).

According to Soucy, EMI sometimes does "sampling" inspection when the pieces are delivered;  for example, NCRF 104999[24] shows that fifty-three pieces were rejected on November 4, 2003, prior to milling.[25]  (See 11/14/06 Tr. 242, 258; 11/15/06 Tr. 252; Exh. 6,

---

[23]See note 19 supra.

[24]Gikas testified that he never saw this NCRF before the day of the hearing. (See 11/15/06 Tr. 70).  According to Gikas, he never heard that fifty-three pieces were scrapped at this time. (See 11/15/06 Tr. at 71).  Gikas knew that EMI had problems with parts after they were milled, but he did not know this until 2004.  (See 11/15/06 Tr. at 71-72).

[25]Soucy determined that this was done prior to milling since the op sheet shows that the inspection was performed in operation number 255 and the operations are sequential with operation 260 being milling work.  (See 11/14/06 Tr. 242-43).  Soucy also testified that he thought that the NCRFs were done both pre- and post-milling because even for non-conforming parts, EMI could still machine them to see if they could be cleaned to satisfy the military. (See 11/14/06 Tr. 244).  Once the parts are milled, Soucy can see the recast layer on one side and the mill layer on the other side.  (See 11/14/06 Tr. at 232).

Soucy also testified that it is common to inspect the pieces to finished dimensions even if they are not finished dimension pieces.  (11/14/06 Tr. 245 & 250).  According to Soucy, an NCRF is written to the final blueprints, making reference to the blueprint tolerance, so any variance from the blueprint tolerance is described on the NCRF.  (See 11/15/06 Tr. 243-44).  Thus, according to NCRF 104999, Soucy reiterated that the parts were inspected prior to milling as the inspection occurred at operation 255 and milling is operation 260 (see 11/15/06 Tr. 242-43), which prior inspection is, admittedly, not the practice of EMI one hundred percent of the time.  (See 11/15/06

Tab 35).  However, according to Soucy, an inspection after the milling work is complete is "better," and one hundred percent of these pieces were inspected after milling.  (See 11/14/06 Tr. 239).

Although Wilder testified, as discussed above, that he did not see any NCRFs with respect to the 5015s before this litigation, Stephens wrote to Wilder on February 16, 2004 referencing NCRF 104999 and offering Advanced Laser the opportunity to inspect the hardware before it was scrapped.  (See 11/15/06 Tr. 179-80; Exh. 23).  Wilder did not avail himself of the opportunity to inspect the parts.  (See 11/15/06 Tr. 180).  Additionally, Wilder himself sent correspondence to EMI referencing the 5015s and NCRF 104999.  (See Exh. 22).  Wilder also acknowledged that he was given the opportunity to inspect the 5015s before they were scrapped but he was not "get[ting] in [his] car and driv[ing] to Connecticut" since the parts should have been sent to him; "[t]hat's normal practice."  (See 11/15/06 Tr. 182-83).  Moreover, in response to Wilder's correspondence,  Stephens gave Advanced Laser the opportunity to "review [the] non-conformances" in the fifty-three pieces that were being held in-house.  (Exh. 23).  Wilder testified he did not review the pieces because if he inspected them at EMI, they would be finished parts and he would be unable to know what the problem was because the finished dimensions are not the "root cause of the problem."  (See 11/15/06 Tr. 214-15). Wilder could not state how he knew they were finished parts since Stephens did not so indicate in her letter (see Exh. 23), but he was "led to believe that they were finished," "somehow [he] was told they were finished."[26] (11/15/2006 Tr. 224).  Wilder

Tr. 245-48).

[26]According to Wilder, NCRF 104999 says that the parts are finished in that the dimensions referenced are finished dimensions. (See 11/15/06 Tr. 224-25).  Additionally, on NCRF 104999, there is a reference to Op 255 which Wilder initially testified that he did not know to what that referred (see 11/15/06 Tr. 227-29), but later testified that the numbers reflect the series of operations in the manufacturing process.  (See 11/15/06 Tr. 229). Wilder next testified that the

adamantly insisted that it was his understanding that the fifty-three pieces were done. (See 11/15/2006 Tr. 224-25, 235-36). Nonetheless, Wilder acknowledged that Stephens' February 16, 2004 letter reads that it is EMI's "intention to submit [these pieces] to the government after [EMI has] run the entire order through our milling operation." (See 11/15/2005 Tr. 224, 235-37; Exh. 23)(emphasis added).

In light of the foregoing, Wilder's testimony that Advanced Laser was not notified of any discrepancies and was not given the opportunity to confirm the discrepancies before the parts were scrapped is not credible.

### c. NOVEMBER 2005 AGREEMENT

Nine months after Stephen's February 2004 letter, Stephens entered into an agreement with Gikas and Wilder,[27] in which the parties agreed upon a twenty percent

---

"Oper 255" as reflected in EMI's traveler, dated June 11, 2003, for the 5015s, is the number of the operator performing the inspection and indicates that milling was done on July 27, 2003. (See 11/15/06 Tr. 230-31, 238-39; Exh. C). Wilder is mistaken, in that Exh. C indicates that Operations 240 and 250 were performed on June 12, 2003, and that the Machine 68 Slot work was performed on July 23, 2003. (Exh. C). Moreover, there is nothing on the traveler that ties it to the fifty-three pieces in NCRF 104999 which Stephens references in her February 16, 2004 letter. (Compare Exh. 23; Exh. C).

Soucy testified that the "OP" numbers refer to the operation number, not the operator number since the operations are done in sequential order; thus, an inspection at 255 is done prior to 260, which is the milling operation. (See 11/15/06 Tr. 228, 248-49).

[27]Gikas testified that it was Wilder who agreed to the discount that was offered by EMI to keep their customer happy (see 11/15/06 Tr. 45-46), whereas Gikas just discussed "ideas for an agreement" with Stephens. (See 11/15/06 Tr. at 75). In contrast, Wilder testified that he never knew about the twenty-percent amount (See 11/15/06 Tr. at 209-10), or that the twenty percent would be continued until $70,000, but "obviously" Gikas knew about the twenty percent amount. (See 11/15/06 Tr. at 210). Despite this testimony, Wilder wrote a letter to Stephens on November 23, 2004, confirming the "proposed cost reductions," with an attached proposal reflecting a twenty percent discount. (See 11/15/06 Tr. at 211-12; Exh. 25). Wilder later testified that "[he] knew about that [November 23, 2004 letter]." (See 11/15/06 Tr. at 211).

Stephens testified that "initially [she] talked to George Gikas, and the next day, [she] talked to George Gikas and Ray Wilder." (See 11/14/06 Tr. 53). According to Wilder, he had a conversation with Stephens regarding this part because "[s]he did [not] want to put [Advanced Laser] out of business, and she wanted to work something out because there [were] problems with the part." (See 11/15/06 Tr. 208).

discount for current and future purchase orders to recoup the $70,000.00[28] loss for the sixty-one pieces that were placed in the MRB at EMI.[29]  (See 11/14/06 Tr. 46, 52-53, 61-62, 96, 138-39; 11/15/06 Tr. 44-45, 76, 213; Exh. N; Exhs. 25-26).  Thereafter, EMI discarded all of the 5015s, because the parties' "dispute was settled."  (See 11/14/06 Tr. 205, 253-54).  However, Advanced Laser did not work off the debt under the parties' agreement because EMI "stopped working with them." (See 11/14/06 Tr. 255, 263).  Despite this agreement , Gikas testified that EMI never told him that Advanced Laser was in default or that they would be held liable for the parts scrapped after milling by EMI.  (See 11/15/06 Tr. 42-43; see also 11/14/06 Tr. 100-01 (Stephens "believe[d] [Advanced Laser] knew that [EMI was] unhappy with making the change.").  Gikas testified that it was not Advanced Laser's practice either to send out Notices of Default or Notices of Breach of Contract.  (See 11/15/06 Tr. 80).

### d. DAMAGES ANALYSIS

Plaintiff submits that EMI suffered a total loss for eighty-four pieces of the 5015s in the amount of $132,672.98.  (See 11/14/06 Tr. 65; Exh. 8; see Exh. 7).  Specifically, the cost breakdown reveals a loss of $3,598.84 for raw materials for finished parts from five subcontractors, which is money expended by EMI for parts before they were sent to Advanced Laser and the money spent on detail components[30] if EMI had been able to use the parts had they been conforming; subcontractor costs in the amount of $1,952 from

---

[28]The loss is $69,815.84 for labor, tooling, raw materials and subcontractor costs incurred by EMI.  (See 11/14/06 Tr. 64).  According to Stephens, the total loss for the sixty-one pieces was $96,345.86 including sales and general administration ["SG & A"] and profit.  (See 11/14/06 Tr. at 65).

[29]According to Stephens, this agreement did not include repayment for EMI's overhead or profit in this matter but EMI agreed to the reduction on grounds that it was "trying to be fair with the vendor," which is EMI's general practice.  (See 11/14/06 Tr. 140-41).

[30]A "detail" is an item that "in and of itself, has to be manufactured and put together with other items to produce an assembly."  (See 11/14/06 Tr. 21).

Metallizing Services Co. and in the amount of $5,795 from Advanced Laser; labor and tooling[31] costs of $58,470, including $2,332.40 for modifying Advance Laser tooling and $4,000 for Advance Laser "Tool Chg, to EMI,"[32] plus fifteen percent sale and general administration [SG & A"] and twenty percent profit,[33] and an additional loss of $36,327.12 for the twenty-three pieces on which the contract closed short.[34]   (Exh. 8).  In addition, EMI still seeks damages on these parts despite the November 2004 Agreement reached by the parties because EMI stopped working with Advanced Laser prior to the pay off.  (See Exh. N).  According to the Purchase Order Reduction Log generated by EMI, a balance of $63,345.50 of the original $70,000 is outstanding.  (Id.; see also 11/15/06 Tr. 49).

According to defendant, plaintiff may not receive the $58,474.00 in labor and tooling charges that it seeks because the rescinded contract was no longer enforceable and the only enforceable agreement under which defendant can be held responsible is Operation 240, Revision D (Dkt. #68, at 3-6); and even if the original agreement was not rescinded,

[31]"Tooling" is "a fixture or an item that is required to hold the part in such an attitude that you can laser it or machine it, to make sure it [is] in compliance with the drawing or op sheet requirements."  (See 11/14/06 Tr. 18-19).  Each part requires its own tooling.  (See 11/14/06 Tr. at 19).

[32]As stated above, according to Stephens, initially EMI did not have to machine the parts that were cut by Advanced Laser but since Advanced Laser could not hold the tolerances to complete the work, EMI had to machine the parts itself.  (See 11/14/06 Tr. 64).  Additionally, EMI had to build a gauge at the request of Advanced Laser so that Advanced Laser could check the parts before shipping them to EMI.  (See 11/14/06 Tr. 64).

[33]Twenty percent profit is standard for EMI if the parts are able to be shipped.  (11/14/06 Tr. 25).  Gikas testified that based on his knowledge and experience, twenty-five percent is the expected profit margin.  (11/15/06 Tr. 79).

[34]Despite this evidence, Stephens testified that "many times" EMI will charge its vendors back for mistakes made, though when EMI bills a job, it includes a two-to-five percent scrap rate for mistakes.  (See 11/14/06 Tr. 98-99).  Additionally, although milling work was not the responsibility of Advanced Laser, Advanced Laser told EMI that it could laser the slots to the blueprint requirements so that EMI would not have to do any milling on the slots but, according to Stephens, EMI was forced to modify the agreement when Advanced Laser could not laser the slots to the requirements.  (See 11/14/06 Tr. at 100-01).

equitable principles, including estoppel and detrimental reliance, require the enforcement of the new agreement since defendant actually performed under the new contract and plaintiff deliberately misled defendant into performing.  (Id. at 6-7).  Plaintiff responds that while the EMI op sheets were revised, the purchase order was not rescinded as there is no evidence that defendant intended a rescission, the purchase order shows on its face that it is simply a supplement to the original purchase order, and the first purchase order was never cancelled.  (Dkt. #72, at 5-7).

e. RESCISSION

Although Stephens testified that when Advanced Laser was unable to produce conforming parts under Operation 240, as specified in the original purchase order No. 110639, EMI "cancelled" the pre-existing purchase order and issued a new purchase order asking Advanced Laser to make the parts according to Operation 240, Revision D (see 11/14/06 Tr. 76-77, 80)(emphasis added), Stephens also testified that EMI would often "supplement[]" a purchase order (see 11/14/06 Tr. 6), and the purchase order for Operation 240, Revision D reads "supplement 2 issued . . . ." (Exh. A).  Moreover, when a vendor is unable to perform on a purchase order, EMI generally issues a subsequent purchase order to tie up loose ends in its paperwork.  (See 11/14/06 Tr. 129-30).    A review of both purchase orders reveals that both bear the same purchase order number 110639, both relate to the same part number and order laser work for the same quantity of parts, both have the same requisition and job numbers, both have the same order date, and both require "NET 30 DAYS" and shipment "BEST WAY."  (Compare  Exh A. & Dkt. #74 with Exh. 6, Tab 1).[35]

---

[35]Plaintiff seeks to add page two of defendant's previously admitted Purchase Order No. 110639 (Exh. A), which plaintiff erroneously thought was already in evidence as part of plaintiff's Exh. 6.  (See Dkt. #74).  This second page completes the Purchase Order; accordingly, plaintiff's Motion to Reopen Evidence in the Hearing on Plaintiff's Application for Prejudgment Remedy (Dkt.

20

The second purchase order No. 110639 is consistent with EMI's stated practice.

Additionally, rescission, "simply stated, [is] the unmaking of a contract." Wallenta v. Moscowitz, 81 Conn. App. 213, 240 (Conn. App.), cert. denied, 268 Conn. 909 (2004). It is an equitable remedy that defendant never pled (see Dkt. #42), and thus may not be asserted as a claim for the first time at this stage of the proceeding. See Rand-Whitney Containerboard Ltd. P'ship v. Town of Montville, 3:96 CV 413(HBF), 2005 WL 2042066, at *4 & n. 3 (D. Conn. Aug. 23, 2005).[36]

### f. CONCLUSION FOR FIRST AND SECOND COUNTS

Under the minimal probable cause standard applicable to a prejudgment remedy application, plaintiff has satisfied its burden of demonstrating that plaintiff may recover the costs incurred to manufacture conforming parts, which includes labor and tooling. The credible testimony of Stephens and Soucy establishes that EMI entered into a new purchase order, revising the dimensions to be lasered for the 5015s, in an effort to continue the employ of Advance Laser which, without such revisions, was unable to produce conforming parts. (See also Dkt. #72, at 7-9). While EMI later contracted with Advanced Laser to manufacture parts to the drawing specifications outlined in Operation 240, Revision D, Advanced Laser still could not meet the specifications, so EMI "ended up having to mill [the parts], in house, . . . in order to make the contract with [its] customers." (11/14/06 Tr. 129). Milling was not a condition of the purchase order, and as Wilder acknowledged, the purchase order is the "Bible." (11/15/06 Tr. 118). Moreover, as Gikas testified, Advanced

---

#74) is granted.

[36]See Travel Center of Fairfield County, Inc. v. Royal Cruise Line Ltd., 154 F. Supp. 2d 281, 288-89 (D. Conn. 2001)(rescission must be specially pleaded as a defense in Connecticut)(citation omitted), aff'd mem. on other grounds, 43 Fed. Appx. 461 (2d Cir. 2002).

Laser was unable to laser the slots so that they could be verified on EMI's CMM (see 11/15/06 Tr. 11), requiring EMI to provide Advanced Laser with a functional gauge. (See 11/15/06 Tr. 19-23, 52, 54, 57-58, 87-88). While Gikas and Wilder testified that the parts underwent a sampling inspection with the use of this functional gauge and a gauge pin, neither Gikas' testimony that the functional gauge replaced the requirement of complying with the op sheets, nor Wilder's testimony that sampling inspection is permissible under the terms of the purchase order, is credible. Additionally, Gikas' and Wilder's testimony that they never received NCRFs with respect to this part, is equally not credible, as the evidence before the Court is explicitly contradictory. Moreover, while defendant urges that it was plaintiff's milling work that caused the non-conformances in the sixty-one pieces, Wilder testified that although he was given opportunity to inspect the 5015s before they were scrapped, he was not "get[ting] in [his] car and driv[ing] to Connecticut" to verify that such pieces were non-conforming prior to undergoing the milling operation. (See 11/15/06 Tr. 182-83).

However, defendant correctly argues that plaintiff's claim for lost profits is overstated because it includes "gross profits" rather than net profit. (Dkt. #68, at 10-12).[37] In order

---

[37]Specifically, defendant proposes the following damages calculation (Dkt. #68, at 12-13):

| | |
|---|---|
| Total Raw Materials/Finished Parts: | $3,598.84 |
| Subcontract Costs: | $7,747.00 |
| Labor & Tooling: | $0.00 |
| Costs Incurred: | $11,345.84 |
| | |
| SG & A @ 15% of Costs Incurred: | $1,701.87 |
| Net Profit @ 20% of Costs Incurred ($2,269.16) | |
| Minus SG & A ($1,701.87) | $567.29 |
| | |
| Total Loss for 61 Pieces: | $13,615.00 |
| Additional Loss for 23 Pieces: | $5,133.52 |
| Total Loss for 84 Pieces: | $18,748.52 |

for a plaintiff to recover lost profits, a plaintiff "must present sufficiently accurate and complete evidence for the trier of fact to be able to estimate those profits with reasonable certainty." Beverly Hills Concepts, Inc. v. Schatz & Schatz, Ribicoff & Kotkin, 247 Conn. 48, 70 (1998). "All the reported cases are in agreement that profit (including reasonable overhead) is the equivalent of net profit plus overhead, or of gross profit including overhead." New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc., 3:97 CV 894(CFD), 2002 WL 229900, at *13 (D. Conn. Feb. 2, 2002)(citation omitted). However, lost profit calculations are calculations of net profits, see Southern New England Tel. Co. v. Coho, No. CV-30476159S, 2006 WL 2867884, at *10 (Conn. Super. Sept. 27, 2006)(multiple citations omitted)("When the courts speak of lost profits they of course talk in terms of net profits."), and net profits "can be defined as the gross amount that would have been received pursuant to the business less the cost of running the business." New England Dairies, 2002 WL 229900, at *13 (citation omitted). Accordingly, plaintiff's damages calculations with respect to its profit must be reduced by the cost of doing business, or its SG & A cost. Thus, plaintiff is entitled to the following damages calculation for the 5015s:

| | |
|---|---|
| Total Raw Material/Finished Parts: | $3,598.84 |
| Subcontract Costs: | $7,747.00 |
| Labor & Tooling: | $58,470.00 |
| Costs Incurred: | $69,815.84 |
| SG & A @ 15% of Costs Incurred: | $10,472.38 |
| Discount Previously Provided (Exh. N) | ($6,654.50) |
| TOTAL: | $12,094.02 |

Plaintiff contends that there is nothing in the record to support defendant's argument that Stephen's damages calculations refer to gross profit as opposed to net profit. (See Dkt. #72, at 15-16). As discussed below, plaintiff is entitled to the recovery of net profit which is the gross profit minus the SG & A.

Net Profit @ 20% of Costs Incurred ($13,963.17)

Minus SG & A ($10,472.38)          $3,490.79

Total Loss for 61 Pieces:          $83,779.01

Additional 23 Pieces:

($83,779.01/61=$1,373.43 x 23)[38]          $31,588.80

Total Loss for 84 Pieces:          $115,367.81

Less Discount Previously Paid:          ($6,654.50)

Total:          **$108,713.31**

### 2. THIRD AND FOURTH COUNTS – P.O. NO. 113820/ PART NO. **2002M98P02**

#### a. PURCHASE ORDERS AND PRODUCTION

On July 8, 2002, EMI placed a purchase order with Advanced Laser for fifty-two pieces of the 2002s and a one time charge for tooling (see 11/14/06 Tr. 28;  Exh. 4, Tab 1), which purchase order was acknowledged by Gikas eleven days later.  (See Exh. 4, Tab 2 & 4).   The acknowledgment from Advanced Laser specifically notes: "1st [Piece] Inspection Required." (Exh. 4, Tab 4; see Tab 7).  There were four supplements added to this purchase order, including increasing the unit price to $500 a piece.  (See 11/14/06 Tr. 28; Exh. 4, Tab 38).  According to Stephens, the parts were laser cut and returned to EMI; several NCRFs were issued and in the end, Advanced Laser failed to perform on the contract, causing EMI to close its contract with its customer "short" because seventy pieces[39] had to be scrapped.

---

[38]See 11/14/06 Tr. 65.

[39]NCRF 106864 indicates that twenty pieces were returned to vendor for rework (Exh. 4, Tab 34; Exh. 24), leaving fifty pieces remaining (See Exh. 5; see also 11/14/06 Tr. 31-32). Advanced Laser never sent a tag, CAR or inspection report with these twenty pieces that needed the rework.

For the purposes of plaintiff's Prejudgment Remedy Application, plaintiff based its damages

(See 11/14/06 Tr. 28-29; Exh. 4, Tabs 19, 28, 34, 48; see Exhs. 15-17).[40]  The 2002s

---

calculations not on the seventy parts actually scrapped, but on the fifty scrapped parts, which is a scrap allowance of twenty-nine percent.  (Dkt. #64, at 4, n.2 & 6; see 11/14/06 Tr. 32). Stephens testified that when EMI bills a job, it includes a two-to-five percent scrap rate for mistakes.  (See 11/14/06 Tr. 98-99). Gikas testified that the scrap rate is about one percent.  (See 11/15/06 Tr. 37).

In addition to the fifty pieces, plaintiff also claims damages for eleven pieces that were returned with no work performed.  (See 11/14/06 Tr. 29-30).

[40]For example, in  NCRF 108053, dated February 28, 2006,  eight pieces were rejected and scrapped for failed air flow (Exh. D), which pieces Stephens testified would pass air flow requirements if the holes had been cut to the dimensions on the operating sheets.  (See 11/14/06 Tr. 105-07; Exh. E).  Defendant counters, however, that defendant "had no ability to evaluate or control whether the parts met airflow" as the airflow testing was performed by plaintiff.  (Dkt. #68, at 13).  Even despite this argument, passing an air flow test is an obligation of Advanced Laser's performance.  (See 11/14/06 Tr. 186, 220-22; Exh. 4, Tab 3, at 3).

Additionally, nineteen pieces were rejected and scrapped in NCRF 105672, dated June 2, 2004, for "[e]xcessive recast left on, and in, slots" (Exh. F), which Stephens testified was not from the milling process since EMI inspected these parts when it received them. (11/14/06 Tr. 107-08, 110-11). NCRF 106580 reveals that in a lot of twenty pieces, EMI inspected twenty-three pieces, which Stephens testified could have been an error or two lots of parts.  (See 11/14/06 Tr. 114-15; Exh. H).  According to Stephens, it is "possible" that the inspector made a mistake.  (See 11/14/06 Tr. 115).  The inspector would make a visual inspection and from that inspection, could see that the slots had an excess amount of material in them.  (See 11/14/06 Tr. 115).  Normally, the parts are inspected by pinning the holes with a "go-no-go pin," but this NCRF does not reveal that any pinning was done; rather, a visual inspection was all that was needed to see that these slots did not meet the operation sheets.  (See 11/14/06 Tr. 115-17).

According to Wilder, although NCRF 105672 (see Exh. 4, Tab 19) indicates that excess recast was left in the holes, to the best of his knowledge, this could not be correct because Advanced Laser would take a sample and send the pieces to an approved lab for testing so that once the remelt or recast was tested, Advanced Laser could use the exact same parameters so that all of the pieces would be the same. (11/15/06 Tr. 128-30). According to Wilder, this was done pursuant to Specification S422 which demands that if a laser is used, the remelt must be checked periodically.  (See 11/15/06 Tr. 130).  Advanced Laser sent EMI a copy of the lab reports reflecting this testing.  (See 11/15/06 Tr. 131).  Wilder testified that it is important not to have too much recast or remelt on the piece because there are specific amounts allowed for on the blueprints and if there is an excess, it tends to chip off inside the hole.  (See 11/15/06 Tr. at 130).

Defendant also questions the veracity of this NCRF, as there is a notation under "Correction Action/Comments" that states "Need to find original paperwork." (Dkt. #68, at 13, citing Exh. 4, Tab 19 (erroneously referred to as Tab 16)).  However, no such comment is found on this NCRF.

As indicated before, Wilder testified that he never saw any NCRFs relating to the 2002s prior to this lawsuit.  Also, as stated above, Wilder testified that he would not have seen NCRF 106864, dated June 7, 2005 because he was not the Quality Manager at this time; either Fred Mascone or Joe DeMauro at Advanced Laser could have seen this NCRF.  (See 11/15/06 Tr. 147-

underwent air flow tests to see if the parts could still be used, which is why the three pieces introduced as evidence at the hearing revealed evidence of sandblasting.[41] (See 11/14/06 Tr. 175; 11/15/06 Tr. 124; Exhs. 15-17). During the test, the parts were sandblasted, the effect of which is to knock the burr out; the process cannot make a hole smaller, it can only make it bigger but just by ten thousands of an inch. (See 11/14/06 Tr. 183; 11/15/06 Tr. 93-94). The holes on Exh. 15 were non-conforming because they were too small, whereas the holes on Exhs. 16 and 17 were too large; they are elongated and could be rejected as non-conforming on a visual inspection. (See 11/14/06 Tr. 180, 190, 193). According to Soucy, when blasting is done on lasered surfaces, it cannot make a conforming part non-conforming as the tolerance for the 2002 slots was $\pm$ .001. (See 11/14/06 Tr. 188). Soucy also testified that EMI submitted some of these parts to General Electric ["GE"], EMI's customer, but GE rejected the parts because they did not have "good" air flow. (See 11/14/06 Tr. 198-99). EMI tried to fix the parts by welding shut some of the holes but it did not work. (See 11/14/06 Tr. 199-200).

In contrast, Wilder testified that the three 2002s marked as exhibits are not consistent with the production that Advanced Laser sent to EMI. (See 11/15/06 Tr. 124; Exhs. 15-17). Rather, these exhibits appear to be prototypes or experimental pieces, as one looks like it was sandblasted and some of the holes were closed, and some holes look like

51).

[41]Soucy testified that the holes in Exh. 15 were cut by Advanced Laser because they were the only laser house that was sent purchase orders for the 2002s. (11/14/06 Tr. 171, 176, 177-78). These three pieces, and "many" more non-conforming 2002s,were stored in the MRB Bond Room in accordance with FAA regulations to prevent non-conforming parts from being co-mingled with the conforming parts, and thus erroneously "end[ing] up in the field." (See 11/14/06 Tr. 158, 172). The parts are non-serialized because they are small components of a much larger piece and it is not permissible to ship these parts to the military with serial numbers. (See 11/14/06 Tr. 168, 173-74). These parts are not "first article" pieces as defendant suggests (see Dkt. #68, at 14); they were from a later stage in the sequence of events. (See 11/14/06 Tr. 178).

26

they underwent a circular motion from a laser rather than the laser "puls[ing] through." (See 11/15/06 Tr. 124).   Through the lasering process, remelt forms on the holes because the laser energy causes a liquid state, which then becomes a solid state that can be removed through wet blasting since it is important to avoid excessive recast.  (See 11/15/06 Tr. 125, 128-30).   In fact, Advanced Laser sent the 2002s to an independent lab to test for excessive recast or remelt prior to submitting the parts to EMI.   (See 11/15/06 Tr. 187-89). Additionally, Advanced Laser did "wet blasting" on all of the 2002s, which can change the conformity of the holes.  (See 11/15/06 Tr. 124-25).   However, according to Wilder, he looked at the 2002s while he was at EMI and the parts had not been wet blasted.  (See 11/15/06 Tr. 125, 135).

Moreover, in contrast to EMI's assessment that a majority of the 2002s were non-conforming, Advanced Laser issued a Certificate of Conformance with respect to nineteen pieces of this part number on May 1, 2004, that was stamped as a "Lab Release" by EMI seventeen days later.  (See 11/15/06 Tr. 127-28; Exh. G).  According to Stephens, the "Lab Release" stamp is issued by EMI to confirm the purchase order number; it does not mean that the pieces met the operation sheet requirements.  (See 11/14/06 Tr. 110-11, 128). Additionally, Advanced Laser completed Inspection Reports, created at the time of inspection of these 2002s, which reflect that a go-no-go-pin was used and the 2002s passed inspection. (See 11/15/06 Tr. 127; Exh. 0).

Soucy testified that neither Gikas nor Wilder from Advanced Laser ever denied that the work on the 2002s was non-conforming.   (See 11/14/06 Tr. 192, 194-95, 197-98). Wilder confirmed that he did speak to Soucy on one occasion, who "expressed concern" about the 2002s and specifically that the holes were not passing air flow testing.  (See 11/15/06 Tr. 131, 133).  However, Wilder insisted that in Advanced Laser's "eyes, [the parts]

were [not] nonconforming."  (See 11/15/06 Tr. 197).

Although defendant contends that "[d]efendant had no ability to evaluate or control" whether the parts met the airflow testing performed by plaintiff (Dkt. #68, at 13), the op sheets explained to defendant how to perform the lasering operations so as to make a conforming part, and passing an airflow test was an obligation of Advanced Laser's performance.  (See 11/14/06 Tr. 6, 179-80, 186, 220-22; Exh. 4, Tab 3, at 3).

### b. DAMAGES ANALYSIS

As a result of the shortage, EMI had to engage additional vendors for these parts. (See 11/14/06 Tr. 30-31; Exh. 4, Tabs 49-53 & 55-56).[42]  Moreover, in addition to the non-conforming pieces, Stephens and Soucy testified that eleven pieces were returned from Advanced Laser with "no work performed."  (See 11/14/06 Tr. 29-30, 201-02).  The eleven pieces are still in EMI's warehouse unfinished.  (See 11/14/06 Tr. 30-31, 201-02). EMI was going to make the tooling for another vendor to complete the work, but according to Stephens, the tooling and development parts incurred with Advanced Laser did not warrant the costs, so EMI requested that GE shorten its contract.   (See 11/14/06 Tr. 31).

Stephens also testified that EMI incurred an additional cost of $3,343.34 for the eleven pieces returned with no work performed, including the costs of materials and forming from additional vendors, heat treat,[43] fifteen percent SG & A and twenty percent profit.

---

[42]Plaintiff also submits that on March 29, 2004, Advanced Laser received a purchase order for forty-two of the fifty-two pieces, at an additional cost incurred by EMI of $12,474 (Exh. 4, Tab 54), and on November 29, 2005, Advanced Laser received a purchase order from EMI for eight pieces of the additional forty pieces added at $500 each, for a total additional cost of $4,000. (Exh. 4, Tab 57).  According to Stephens, EMI had already paid Advanced Laser for the previous, non-conforming parts.  (11/14/06 Tr. 34).

[43]Stephens testified that "heat treat" is a process whereby the parts go through a furnace to be brought up to a certain temperature and then cooled down.  (See 11/14/06 Tr. 36). It takes ten-and-a-half hours to heat treat these parts. (See 11/14/06 Tr. 36-37).

(11/14/06 Tr. 29-30; Exh. 5, at 2). For the fifty pieces that were scrapped, plaintiff seeks a total of $36,882.45 for material, forming and blasting from additional vendors, laser work from Advanced Laser, heat treat, fifteen percent SG & A and twenty percent profit. (See 11/14/06 Tr. 31-35; Exh. 5, at 1). The total damages EMI is claiming for the 2002s is $40,225.79. (See 11/14/06 Tr. 37; Exh. 5, at 1).

Defendant responds that plaintiff's damages are overstated and instead suggests a reduction to $34,978.95 which includes the loss of the fifty pieces and the eleven pieces with fifteen percent SG & A and twenty percent net profit (Dkt. #68, at 14), with which profit calculations this Court agrees for the reasons stated in Section I.B.1.f. supra. Accordingly, plaintiff's damages for the 2002s for the purpose of this prejudgment remedy attachment are as follows:

| | |
|---|---|
| 50 Pieces: | |
| Costs Incurred: | $26,726.42 |
| SG & A @ 15% of Costs Incurred: | $4,008.96 |
| Net Profit @ 20% of Costs Incurred ($5,345.28) | |
| Minus SG & A ($4,008.96) | <u>$1,336.32</u> |
| Total Loss for 50 Pieces: | $32,071.70 |
| 11 Pieces: | |
| Costs Incurred: | $2,422.71 |
| SG & A @ 15% of Costs Incurred: | $363.41 |
| Net Profit @ 20% of Costs Incurred ($484.54) | |
| Minus SG & A ($363.41) | <u>$121.13</u> |
| Total Loss 11 Pieces: | $2,907.25 |
| <u>Total Loss 50 Pieces and 11 Pieces:</u> | **$34,978.95** |

## 3. FIFTH COUNT – P.O. NOS. 121715, 124545 & 125895/
## PART NOS. **1804M55P04, L56773P02 & 1804M55P03**

### a. PART NO. 1804M55P04

With respect to part number 1804M55P04, EMI placed a purchase order with Advanced Laser for sixty-four pieces, and added several supplements which eventually increased the total number to one hundred and seventy-four pieces.  (See 11/14/06 Tr. 66; Exh. 9).  Advanced Laser had shipped some parts but advised EMI that Advanced Laser's rotary cable was broken and that Advanced Laser estimated that it could be three days or a week to repair the cable.  (See Tr. 11/14/06 Tr. 66; 11/15/06 Tr. 171).  Accordingly, Wilder contacted  Stephens and told her that Advanced Laser would need at least a two week turn-around time to complete the work.  (See 11/15/06 Tr. 106-08, 171).  As for this part and the two parts discussed in Section I.B.3.b-c. infra, Stephens testified that EMI cancelled these purchase orders because EMI wanted the parts completed faster than Advanced Laser could do them, which, in this case, was a turn-around time of less than a week.  (See 11/14/06 Tr. 118-19; 11/15/06 Tr. 109-10, 171).  However, the purchase orders for these three parts indicated that EMI wanted delivery of the parts on September 30, 2005, even though the parts were not sent to Advanced Laser until September 20, 2005.  (See 11/14/06 Tr. 121-22; Exh. 9).  Although EMI's delivery of its parts to Advanced Laser was "later than [it] anticipated,"  EMI still wanted the parts back from Advanced Laser as "quickly as possible."  (See 11/14/06 Tr. 122).

Advanced Laser did not have a contractual obligation to make delivery in less than a week, but rather in a "timely fashion."  (See 11/14/06 Tr. 120-21; see Dkt. #68, at 15-16).

EMI "voluntarily"[44] cancelled the purchase orders and told Advanced Laser that EMI would have to place a purchase order with another vendor in order for EMI to make delivery to its client. (See 11/14/06 Tr. 123-24). EMI's claimed damages include the labor costs for re-manufacturing the tooling and creating tooling for the new vendor, in the amount of $3,704.40. (See 11/14/06 Tr. 67-68; Exh. 10).

### b. PART NO. L56773P02

EMI placed a purchase order on March 22, 2005 for ten pieces for this part number and Advanced Laser sent the pieces back because they were having a problem with the rotary table, as discussed above. (See 11/14/06 Tr. 69; Exh. 11; see Exh. 21). Additionally, on September 28, 2005, Stephens faxed a letter informing Wilder that EMI was sending an additional twenty-two pieces on this part number that EMI needed "ASAP." (Exh. 20; see 11/15/06 Tr. 170-71). No work was performed by Advanced Laser on these pieces, and EMI had to manufacture tooling for a new vendor. (See 11/14/06 Tr. 69; 11/15/06 Tr. 176-77). While Advanced Laser had the tooling necessary for the completion of the job, Advanced Laser needed more time for delivery of the pieces than the purchase orders would allow. (See 11/15/06 Tr. 109-10). Advanced Laser shipped the parts back to EMI almost two weeks after they were received. (See 11/15/06 Tr. 177). EMI claims damages with respect to Part No. L56773P02 in the amount of $2,800. (See 11/14/06 Tr. 69; Exhs. 10-12).

### c. PART NO. 1804M55P03

Stephens also testified that EMI incurred the cost of retooling as to Part No. 1804M55P03 for the same reasons as stated above. (See 11/14/06 Tr. 70). The twenty-two

---

[44]Stephens also testified that EMI was "forced" to cancel the purchase orders. (See 11/14/06 Tr. 67, 124, 129). Stephens conceded that because at that time she did not know the additional cost EMI would incur, she did not tell Advanced Laser that it would be liable for these costs. (See 11/14/06 Tr. 124).

pieces that were the subject of this purchase order were returned to EMI on October 12, 2005, two weeks after Advanced Laser received the parts. (See 11/15/06 Tr. 172-73; Exh. 13, at 6). EMI claims damages in the amount of $769.30. (Exhs. 10 & 13-14).

### d. TOTAL DAMAGE ANALYSIS FOR FIFTH COUNT

The total damages EMI claims for the Fifth Count is $7,273.70. (See 11/14/06 Tr. 71; Exh. 10). Defendant argues that plaintiff's alleged damages for this count are overstated as defendant sent the proper tooling to plaintiff when defendant returned the parts, so that plaintiff unnecessarily paid for tools previously supplied by defendant, and plaintiff failed to reasonably mitigate its damages. (Dkt. #68, at 16).

As stated above, Stephens testified that EMI "voluntarily" cancelled these purchase orders because they wanted the parts completed faster than Advanced Laser could accomplish, which, in this case, was a turn-around time of less than a week. (See 11/14/06 Tr. 118-24; 11/15/06 Tr. 109-10, 171). Additionally, the purchase orders for these three parts reveal that although EMI expected delivery of the parts on September 30, 2005, the parts were not sent to Advanced Laser until September 20, 2005, which delivery was admittedly "later than [EMI] anticipated." (See 11/14/06 Tr. 121-22; Exh. 9). Moreover, as Stephens acknowledged, Advanced Laser did not have a contractual obligation to make delivery in less than a week, but rather in a "timely fashion." (See 11/14/06 Tr. 120-21). Finally, as defendant observes, despite defendant's return of the specialized tooling to plaintiff, and despite plaintiff's alleged urgency to complete the parts, the substitute work was not performed on these parts until mid-November and December 2005 and January 2006. (See Exhs. 9, 11 and 13; see Dkt. #68, at 15-16). Accordingly, the evidence presented by plaintiff does not establish probable cause to sustain the validity of this claim.

## 4. SIXTH AND SEVENTH COUNTS --P.O. NO. 125805 / PART NO. 9528M94G01

EMI placed purchase order No. 125805 with Advanced Laser for laser cutting services on twenty-four parts on June 1, 2005. (See Exh. 2, Tab 1). EMI sent the parts, which were eighty-five to ninety percent complete, and Advanced Laser performed the work and returned the parts to EMI, at which time EMI found a non-conformance with the drawings and op sheets, in that the holes were put in at the wrong angle. (See 11/14/06 Tr. 17-18; Exh. 2, Tab 2). EMI sent two parts back to Advanced Laser so that it could verify the non-conformance. (See 11/14/06 Tr. 17-18). Advanced Laser did not tag any of the non-conforming pieces because, according to Wilder, "in our eyes, they were [not] non-conforming." (See 11/15/06 Tr. 197). Advanced Laser returned the parts to EMI, and EMI then designated them as scrap and was "forced to re-manufacture the parts in order to meet [its] customer's delivery requirements." (See 11/14/06 Tr. 17). EMI completed NCRF 107130, dated December 17, 2005, which stated that twenty-four parts of a twenty-four quantity lot were inspected and twenty-four parts were rejected. (Exh. 2, Tab 4). According to Soucy, this NCRF shows that two of the holes were off location for proper airflow, which is enough to scrap the part.[45] (See 11/14/06 Tr. 152, 155-56). Four days later, in a letter to Wilder, Stephens noted that, with respect to Part No. 9528M94G01, Advanced Laser did not send a "first piece" to EMI "because [Advanced Laser was] rather late with [its] delivery," and as a result, Stephens was "looking at probably scrapping these parts out if Engineering can not figure out a way to shift some of these dimensions so [that EMI] can use the parts."

---

[45] The holes are lasered in a repetitive pattern on the part and if one is set off position, depending on how the laser is programed, typically all of the holes would be off. (See 11/14/06 Tr. 156). According to Soucy, the programming should be set back to "Datum C" which "in simplistic terms" is just a starting point. (See 11/14/06 Tr. 156-57).

(Exh. 2, Tab 5). In a letter, dated February 14, 2006, Dave Lydon, President of Advanced Laser, informed Randy Fries at EMI that Advanced Laser "acknowlege[s] there are problems with these parts [9528M94G01] and [that Lydon is] willing to issue credit for the full invoice amount." (Exh. 2, Tab 8; see Exh. 3, at 2).

Although Advanced Laser issued a credit to EMI as a result of the non-conformances (Exh. 3, at 2; cf. 11/14/06 Tr. 152-53), EMI incurred the cost of engaging another vendor. (See 11/14/06 Tr. 18, 24). Stephens testified that the cost to re-manufacture the twenty-four parts that EMI was forced to scrap was $17,896.87, which included the costs for material, labor and subcontracting costs, including "tooling," the "assembly," and "manufactur[ing] a detail," less a credit, plus fifteen percent SG & A and twenty percent profit. (See 11/14/06 Tr. 23-25; Exh. 2, Tabs 11-19; Exh. 3).

Defendant does not dispute its responsibility for the non-conforming parts, but rather contends that plaintiff's damages for the 9528s are overstated, and to the extent any damages are ordered, should be limited to $15,562.83, which total includes the $3,240 credit issued by Advanced Laser and SG & A at fifteen percent of costs incurred and net profit at twenty percent of costs incurred minus SG & A. (Dkt. #68, at 16; see 11/14/06 Tr. 153). For the reasons stated in Section I.B.1.f. supra, this Court agrees with defendant's damage analysis. Accordingly, plaintiff's damages calculation for the 9528s is as follows:

| | |
|---|---|
| Costs Incurred: | $16,209.03 |
| Less Credit Issued: | ($3,240) |
| | $12,969.03 |
| SG & A @ 15% of Costs Incurred: | $1,945.35 |
| Net Profit @ 20% of Costs Incurred ($2,593.81) Minus SG & A ($1,945.35) | $648.46 |

34

Total Loss:                              **$15,562.84**

         C. DAMAGES

As previously indicated, damages "need not be established with precision but only on the basis of evidence yielding a fair and reasonable estimate." Savalle, 2001 WL 1913746, at *2 (citation omitted).  In its post-hearing brief, plaintiff calculates its damages claims to date for the seven counts as $198,069.34, exclusive of setoff, attorneys' fees and expenses. (Dkt. #64, at 8; see also 11/14/06 Tr. 71-72).[46]  In contrast, in its post-hearing brief, defendant estimates that "at most," plaintiff's damages for the seven counts are $62,645.80, again exclusive of setoff, attorneys' fees and expenses.  (Dkt. #69, at 1, 17).[47]  For the reasons stated in Sections I.B.1.f, I.B.2.b, I.B.3.d and I.B.4 supra, the Magistrate Judge concludes that plaintiff's damages to date for the seven counts, again exclusive of setoff, attorneys' fees and expenses, is $159,255.10, are as follows:

         First and Second Counts        $108,713.31

         Third and Fourth Counts        $ 34,978.95

--------------------------

    [46]As previously indicated, the breakdown for this calculation is as follows:

|                          |             |
|--------------------------|-------------|
| First and Second Counts  | $132,672.98 |
| Third and Fourth Counts  | $ 40,225.79 |
| Fifth Count              | $  7,273.70 |
| Sixth and Seven Counts   | $ 17,896.87 |
| TOTAL                    | $198,069.34 |

(Dkt. #64, at 3, 4, 6, 7, 8).

    [47]As previously indicated, the breakdown is as follows:

|                          |             |
|--------------------------|-------------|
| First and Second Counts  | $12,094.02  |
| Third and Fourths Count  | $34,978.95  |
| Fifth Count              | $     0.00  |
| Sixth and Seventh Counts | $15,562.83  |
| TOTAL                    | $62,635.80  |

(Dkt. #69, at 12-13, 14, 16-17).

| | |
|---|---|
| Fifth Count | $ 0.00 |
| Sixth and Seven Counts | $ 15,562.84 |
| TOTAL | **$159,255.10** |

In their post-hearing briefs, both parties have deducted from plaintiff's damages a setoff in the amount of $19,588.50 (Dkt. #64, at 8; Dkt. #69, at 17; <u>see also</u> 11/14/06 Tr. 71-72). Plaintiff's purchase order provides, in relevant part, "Buyer [plaintiff] shall have the right to setoff against any money's [sic] owed to Seller [defendant] as a result of failure to perform any obligations hereunder." (Exh. 9, Bates Stamp 000536, ¶ 12). As previously indicated, while defendant originally demanded this amount in its Counterclaim (<u>see</u> Dkt. #9), on October 4, 2006, defendant amended its answer in which it asserts affirmative defenses but no longer asserts a counterclaim against plaintiff. (Dkt. #42). However, given that neither side disputes that defendant is entitled to an offset of $19,588.50, the damages are thus reduced to $**139,666.60**.

### D. ATTORNEYS' FEES AND EXPENSES

In its post-hearing brief, plaintiff further urges the Court to "take into account possible prejudgment interest and additional attorneys' fees and expenses when making its order," which raises its claimed damages to a minimum of $343,000.85. (Dkt. #64, at 13-14). Plaintiff therefore seeks a prejudgment remedy in the amount of $450,000. (<u>Id.</u>; <u>see also</u> Dkt. #53).

Pursuant to the terms and conditions of plaintiff's purchase order, "If the Seller [defendant] shall default in its obligations hereunder, Seller [defendant] shall be responsible for all expenses incurred by Buyer [plaintiff], including reasonable attorneys [sic] fees, in enforcing its rights hereunder . . . ." (Exh. 9, Bates Stamp 000536, ¶ 11). Plaintiff seeks a total of $164,520.01 in attorneys' fees and expenses. (<u>See</u> Dkt. #59, ¶¶ 3, 40). In support

thereof, plaintiff submits an affidavit of its counsel, Rodger Boe, along with his time records and the time records of Attorneys Jean M. Sorich and James F. Bryne, of attorney Boe's law firm; Boe seeks $115,110.50 for his and Attorney Sorich's time, and $2,532.50 for James Byrne's time.  (Dkt. #59, ¶¶ 37-38 & Exhs. B-C).[48]  Additionally, plaintiff's counsel submits its records of costs, totaling $6,877.01.  (Dkt. #59, ¶ 39 & Exh. D).

As the purchase orders explicitly provide, defendant shall be responsible for "reasonable" attorney's fees in enforcing its rights.  A showing of reasonableness is required under Connecticut law.  See General Elec. Capital Corp. v. Hoppes, 3:04 CV 1161(WWE)(WIG), 2005 WL 2256526 , at *3 (D. Conn. Apr. 29, 2005)(citation omitted). Specifically,  "there is an undisputed requirement that the reasonableness of attorney's fees and costs must be proven by an appropriate evidentiary showing."  Rand-Whitney Containerboard Ltd. P'ship v. Town of Montville, No. 3:96 CV 413 (HBF), 2006 WL 2839236, at *5 (D. Conn. Sept. 5, 2006)(multiple citations & internal quotations omitted).  While "[c]ourts have a general knowledge of what would be reasonable compensation for services which are fairly stated and described," evidence presented by the moving party, who bears the burden of proving reasonableness, is also "necessary to support a finding of reasonableness."  Id. at **5-6 (multiple citations omitted).  Additionally, under Connecticut law, courts look to the twelve factors cited in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir. 1974), to determine reasonableness:

---

[48]Plaintiff seeks the following hourly rates: $160/hour for Attorney Sorich, $305/hour for Attorney Boe, and $375/hour for Attorney Bryne.  (Dkt. #59, ¶ 4).   Defendant objects to Attorney Boe's hourly rate, citing to a 2005 Connecticut Superior Court decision that awarded an attorney $285/hour in a complex secured transaction matter (Dkt. #60, at 9, n. 3), and further objects to the combined hourly rate of $465 for Attorneys Boe and Sorich.  (Id. at 9).

In its reply brief, plaintiff argues that the $285/hour rate in the state case was not in dispute and that typical rates in the Hartford area for senior associates run from $360/hour to $430/hour.  (Dkt. #75, at 9 & Exh. A).

(1) the time and labor required;
(2) the novelty and difficulty of the questions:
(3) the skill requisite to perform the legal service properly;
(4) the preclusion of other employment by the attorney due to acceptance of the case;
(5) the customary fee for similar work in the community;
(6) whether the fee is fixed or contingent;
(7) the time limitations imposed by the client or the circumstances;
(8) the amount involved and the results obtained;
(9) the experience, reputation and ability of the attorneys involved;
(10) the undesirability of the case;
(11) the nature and length of the professional relationship with the client; and
(12) awards in similar cases.

See Rand-Whitney, 2006 WL 2839236, at *7 (multiple citations & internal quotations omitted).

While under New York law, a fee award that exceeds the amount at stake in the litigation "would normally appear to be unreasonable," Diamond D Enter. USA, Inc. v. Steinsvaag, 979 F.2d 14, 19 (2d Cir. 1992)(multiple citations omitted), cert. denied, 508 U.S. 951 (1993), the underlying principle supporting this rationale would equally apply the closer an attorneys' fee award comes to the amount actually involved in the litigation. As addressed before, in this case, plaintiff claimed damages of $198,069.34, minus the setoff of $19,588.50, for a loss of $178,480.84 (see Section I.C supra), yet seeks attorneys' fees and costs in an amount exceeding $164,520, which amount is strikingly disproportionate to the damages and is a "ratio that is nearly one to one." (Dkt. #60, at 6).

In its opposition, while defendant does not take issue with the applicability of the twelve Johnson factors (Dkt. #60, at 5), it does contest the excessiveness of the billable hours, particularly the continuous use of two attorneys at a combined rate of $465/hour[49] (Dkt. #60, at 6-9), the disproportion between the fees and costs and the amount of damages

---

[49]See note 48 supra.

claimed (id. at 5-6), and the "vague" nature of plaintiff's counsel's billing records. (Id. at 9-10). In his affidavit in support of his request for attorneys' fees, plaintiff's counsel states that he has been forced to expend this amount of time and effort on this file as a result of defendant's refusal to engage in meaningful settlement discussions (Dkt. #59 ¶¶ 7-21); defendant's "unnecessary and very unusual" decision to file an objection to plaintiff's PJR application (id. ¶¶ 22-23), in response to which plaintiff was "required" to file opposition papers (id. ¶ 25); defendant's refusal to provide inspection reports (id. ¶¶ 27-31); and defendant's refusal to consent to evidence, thus causing plaintiff to spend a "tremendous amount of time preparing for the prejudgment remedy hearing." (Id. ¶¶ 32-36).

The Second Circuit cautions that in a case such as this, where "a fee-shifting clause can produce perverse incentives for a litigant (and [its] attorneys) . . . , courts must scrutinize fee requests to ascertain whether they are reasonable." Diamond, 979 F.2d at 19 (citation omitted). While the factual issues in this matter required tedious attention, see Section I.B. supra, this lawsuit, unlike Rand-Whitney, does not involve "complex issues not normally found in an ordinary breach of contract case," nor are they novel and difficult questions of fact or law that have been litigated for a decade. See 2006 WL 2839236, at *8. Rather, this lawsuit is a mere nine months old, and as of the date of the affidavit in support of attorneys' fees, each side briefed a total of two discovery motions in addition to briefing the pending motions, and the prejudgment remedy hearing lasted two days, with two witnesses from each side. (See Dkts. ##5-6, 10-11, 44-45, 48, 50-53, 59-60).[50]

The sixty billable hours that plaintiff's counsel accumulated while preparing and filing

_____

[50]Plaintiff filed two motions to strike affirmative defenses (Dkts. ##16 & 47; see also Dkt. #43) and defendant filed a Motion to Amend/Correct (Dkt. #33), to which plaintiff did not file an opposition, so that the motion was granted by Judge Arterton, absent objection. (See Dkt. #38).

the complaint and prejudgment remedy papers (from April 17, 2006 through May 2, 2006) are inordinate, as are the one hundred and ten billable hours that Attorney Boe and Sorich spent on hearing preparation (from November 1, 2006 through November 13, 2006). (See Dkt. #59, Exh. B, at 1-6, 13-14, 25, 27, 32, 44-51; Dkt. #60, at 6-7). The sixty hours for preparation of the complaint and PJR application are reduced to twenty hours, or $9,300 (a reduction of $18,600 from the requested $27,900). Similarly, the one hundred ten hours spent on hearing preparation are reduced to forty hours for Attorney Sonich (who handled much of the work) at $160/hour, or $6,400, and twenty hours for Attorney Boe, at $305/hour, or $6,100, for a total of $12,500 (a reduction of $38,650 from the requested $51,150).

Moreover, defendant contests the duplicative efforts of Attorney Boe and Sorich, in preparing for and attending the prejudgment remedy hearing, with a combined billing rate of $465.00/hour. (Dkt. #60, at 8-9). A billing rate of $465.00/hour for the hearing is clearly excessive. See Oliver v. Cole Gift Ctrs., Inc., 3:97 CV 2595 (GLG), 1999 WL 1335032, at *3 (D. Conn. Dec. 24, 1999)("a combined rate of $450 per hour . . . for the trial of this action . . . is excessive."). As now retired Senior U.S. District Judge Gerhard Goettel described the employment discrimination case in Oliver, it was "a relatively simple case factually and the legal theories were straightforward," with "few exhibits," three significant witnesses, and trial only lasted two days. Id. at *2. When cases are "overstaffed and . . . [the] hours . . . are excessive, redundant, or otherwise unnecessary [, those hours] should be excluded from the fee calculation." Id. at *2 (citation & internal quotations omitted). Further, "an award of attorney fees is not to serve as full employment or continuing education programs for lawyers. . . ." Rand-Whitney, 2006 WL 2839236, at *19 (citation & internal quotations omitted). While a "trial court should ordinarily greet a claim that several lawyers were

required to perform a single set of task with healthy skepticism," nonetheless, "courts should be mindful of the fact that complex modern litigation may require multiple attorneys to handle even seemingly simple tasks." Id. (multiple citations omitted). As a result, "[m]ost courts agree that percentage reductions are proper when determining an appropriate decrease in hours for excessive hours/overstaffing." Id. at *20.

Attorney Sorich obviously provided invaluable service to Attorney Boe during the two-day hearing, particularly in light of her facility to locate the multiple exhibits, the large number of which made the PJR hearing more complicated than otherwise would have been expected.[51] However, Attorney Sorich herself did not participate in the hearing, such as in examining witnesses or participating in arguments about the admissibility of evidence. As indicated above, this lawsuit simply did not justify a combined hourly rate of $465 for the two-day evidentiary hearing. Therefore, Attorney Sorich's 23.8 billable hours for the two-day hearing are reduced by one-third to $2,536.67 ($3,808 minus $1,269.33).

Defendant also contends that plaintiff's counsel's billing records "are rife with vague entries that offer no explanation as to the work performed," including "Work on documents and chart," "Work on various items," "Work on documents," "Hearing preparation," "Preparation for hearing," and entries for conferences and telephone conferences that "offer no insight as to the issues being discussed or the reasonableness of time spent in those conferences." (Dkt. #60, at 9-10). Although plaintiff's counsel are "not required to record in great detail how each minute of [their] time was expended, . . . counsel should at least identify the general subject matter of his [or her] time expenditures," and in the absence of such identification, a court may refuse to award fees based on those entries. Rand-Whitney,

---

[51]See note 4 supra.

2006 WL 2839236, at *16 (citation & internal quotations omitted). This Magistrate Judge agrees with defendant with respect to the entries, totaling 14.8 hours, on September 22, October 11 and October 12, referencing "Work on documents and chart," "Work on various items," and "Work on documents"; these entries are vague and not compensable. (See Dkt. #60, Exh. B, at 34, 39). Therefore, an additional $6,882 is reduced from the fee application.

Plaintiff's counsel's billable records include two entries that reference travel (Dkt. #59, Exh. B, at 5-6 & 42), which entries total 9.8 hours for Attorney Sorich, for a total of $1,568.00, which amount defendant argues should be reduced by fifty percent. (Dkt. #60, at 7). While "[m]ost courts . . . allow counsel to recover the travel time spent working and preparing the . . . case," this District and the Second Circuit apply the fifty percent reduction method for such time. Rand-Whitney, 2006 WL 2839236, at *22 (internal quotations & multiple citations omitted). Accordingly, the entries referencing travel shall be reduced by fifty percent, totaling $784.00. Finally, as defendant correctly argues (Dkt. #60, at 7), plaintiff's counsel's entries for .7 hours on June 20, 2006 and June 27, 2006 regarding "Work[ing] on problems with e-filing system," and "Addressed problems with e-filing" are not compensable (Dkt. #59, Exh. A, at 15 & 17), thus reducing the fee application by an additional $112.00.

Lastly, defendant correctly observes that the hours billed by Attorney Byrne at $375/hour are redundant and unnecessary (Dkt. #60, at 8), as his role in this case is limited to reviewing the documents and conferring with lead counsel, Attorney Boe, an attorney with almost thirty years of experience. (See Dkt. #59, Exhs. A & C). Therefore, plaintiff's fee application is reduced by an additional $2,532.50. (Dkt. #59, Exh. C, at 3).

In addition to attorneys' fees, plaintiff's counsel seeks costs totaling $6,877.01 (Dkt. #59, ¶ 39 & Exh. D), which amount ordinarily may be recoverable as "[p]laintiff is entitled

to recover reasonable out-of-pocket expenses that were incurred . . . and that are normally charged to a fee-paying client." Rand-Whitney, 2006 WL 2839236, at *24 (citation omitted). Again, as defendant has observed (Dkt. #60, at 10), these costs include three parking tickets (at $15 each) and some photocopying expenses, from $.25 per page to $3.75 per page. However, due to the de minimus nature of most of these items, it is not an appropriate expenditure of this Magistrate Judge's time to review in detail the eighteen pages of expenditures. (See also Dkt. #75, at 3-4).

Accordingly, probable cause exists for the recovery of attorneys' fees as follows:

| | |
|---|---:|
| Total Attorneys' Fees Claimed: | $164,520.00 |
| Less Reduction for Drafting Complaint and PJR Application | ($ 18,600.00) |
| Less Reduction for Preparation for PJR hearing: | ($38,650.00) |
| Less Reduction for Attorney's Sorich's Time at PJR Hearing | ($ 1,269.33) |
| Less Reduction for Vague Entries | ($ 6,882.00) |
| Less Reduction for Travel Time | ($    784.00) |
| Less Reduction for E-filing Entries | ($    112.00) |
| Less Reduction for Attorney Bryne's Time | ($ 2,532.50) |
| **Subtotal:** | **$ 95,690.17** |
| **Plus Costs:** | **$  6,877.01** |

D. PREJUDGMENT DISCLOSURE OF ASSETS

CONN. GEN. STAT. § 52-278n(c) provides that a "court may order disclosure at any time prior to final judgment after it has determined that the party filing the motion for disclosure has . . . probable cause sufficient for the granting of a prejudgment remedy." See also Security Ins. Co. of Hartford v. Trustmark Ins. Co., 3:00 CV 1247 (PCD), 3:01 CV 2198 (PCD), 2002 WL 32506290, at *4 (D. Conn. Aug. 12, 2002). Once a plaintiff has established

probably cause, disclosure requested may be ordered by the court. Id.[52]   Therefore, defendant shall respond on or before **February 28, 2007**.

## II. CONCLUSION

For the reasons stated above, plaintiff's Application for Prejudgment Remedy (Dkt. #5) is <u>denied as moot</u>; plaintiff's Motion to Reopen Evidence (Dkt. #74) is <u>granted</u>; plaintiff's Motion for Additional Pages (Dkt. #73) is <u>granted</u>; plaintiff's Motion for Prejudgment Disclosure of Property and Assets (Dkt. #6) is <u>granted so that defendant shall respond on or before</u> **February 28, 2007**; and plaintiff's Amended Motion for Prejudgment Remedy (Dkt. #53) is <u>granted in part in the amount of **$250,000** ($**139,666.60** in damages, **$ 95,690.17** in attorneys' fees and **$6,877.01** in costs, totaling **$242,233.78**)</u>.[53]

This is not a Recommended Ruling but a Ruling on discovery, the standard of review of which is specified in 28 U.S.C. § 636; FED. R. CIV. P. 6(a), 6(e) & 72; and Rule 72.2 of the Local Rules for United States Magistrate Judges.  As such, it is an order of the Court unless reversed or modified by the District Judge upon timely made objection.

<u>        See</u> 28 U.S.C. § 636(b)**(written objections to ruling must be filed within ten days after service of same);**  FED. R. CIV. P. 6(a), 6(e) & 72; Rule 72.2 of the Local Rules for United States Magistrate Judges, United States District Court for the District of Connecticut; <u>Small v. Secretary, H&HS</u>, 892 F.2d. 15, 16 (2d Cir. 1989)**(failure to file**

---

[52]Originally, plaintiff requested that the Court grant its Motion for Disclosure of Assets, or, as an alternative, if defendant obtained a security bond, an order from this Court directing defendant to disclose the name of the proposed surety.  (Dkt. #64, at 14).  Defendant responded that plaintiff's request was "premature," as no PJR had been ordered yet, nor had defendant elected to substitute a bond.  (Dkt. #68, at 17).  In its reply brief, plaintiff simply requests that this Court grant its motion for disclosure of assets.  (<u>See</u> Dkt. #72, at 16; Dkt. #64, at 14).

[53]Counsel shall contact this Magistrate Judge's Chambers promptly for a continued settlement conference.

**timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit).**

     Dated at New Haven, Connecticut, this 7th day of February, 2007.


/s/_____
Joan Glazer Margolis
United States Magistrate Judge